MICHAEL A. FATUROTI, P.O. BOX 230013, BOSTON, MA 02123-0013

HON. NANCY GERTNER, U.S. DISTRICT JUDGE, U.S. DISTRICT COURT OF MASSACHUSETTS.

| | |
|---|---|
| MICHAEL A. FATUROTI, | ) |
|     Petitioner, | ) |
| | ) Civil Action No. |
| v. | ) 04-11791-NG |
| | ) 12/24/2005. |
| IMMIGRATION & CUSTOMS | ) |
| ENFORCEMENT, | ) |
|     Respondent. | ) |

PETITIONER FATUROTI'S RESPONSE TO U.S. ATTORNEY'S OFFICE NEW MOTION TO DISMISS.

Your Honor, Petitioner acknowledges U.S. Attorney's new motion to dismiss dated 12/21/2005 based on the excuse that Petitioner did not appear for hearing to consider Hon. Dein's Report and Recommendations scheduled for 12/14/2005. All other points mentioned in the brief have been properly dealt with. There is no reason to repeat them again.

Your Honor, Petitioner will appreciate it if the District Judge can continue to disregard and/or ignore the motion.

From previous briefs, it has been established that the authors of this present brief are either unauthorized aliens or disbarred attorneys. As a result, they neither have subject-matter nor the legal jurisdiction to practice law in the United States. In layman's language, they never attended any Law School. They have no training in law. They lack competency not only in law but also in Immigration law. They never have the bar licence to practice law. They are not legally qualified to practice law. Finally, they are not legally admitted into the country. Hence they can neither work nor practice law in the United States. If anyone of them ever has the bar licence, it must have been lost to disbarment. (Merrian-Webster's Collegiate Dictionary 10th Edition 1999); (Gifis. Law Dictionary. 3rd Edition. Barron's Educational Series, Inc. 1991). p. 260); Words and Phrases Permanent Edition. Vol. 23A. West Group 2002 p. 105: McGinley v. Scott, 164 A. 2d 424; 401 Pa. 310 - Courts 17; Potteiger v. Fidelity-Philadelphia Trust Co., 227 A.2d 864; 424 Pa. 418 - Courts 11, 17) 28 USC §1330 et seq.).

From a brief investigation conducted by the Petitioner, it appears that Mr. Michael J. Sullivan no longer has anything to do with the case. Mr. Mark J. Grady is still an unauthorized alien who neither has the legal training nor the bar licence to be hired by the U.S. Attorney's Office. It is a crime to hire an unauthorized alien. 18 USC §1546; 8 USC §1324(a); U.S. v. Chauvin, U.S. District Court for the Eastern District of Virginia, Cr. No. 88-00236-A. See: Ledvinka & Scarpello. Federal Regulation of Personnel and Human Resource Management 2nd Edition. Kent Series In Human Resource Management. PWS-KENT Publishing Co., 1991 pp. 79 - 95 esp. p.92; Pivec & Lamdin. Practical Implications of the Immigration Reform & Control Act of 1986 in Federal Immigration Laws: Regulations & Forms. St. Paul, Minn., West Publishing Co. 1989 Edition pp. XIX-XLII) esp. pp. XXII & XXX.

Also, Petitioner never asked for a hearing. The notice of hearing sent out was to discuss Hon. Dein's Report and Recommendations. Petitioner is not required to attend the hearing because he is not part of the decision-making body. Therefore, for the U.S. Attorney's Office to ask for dismissal of petition for failing to attend a conference to which Petitioner was not invited is unfair.

Further, it appears that Mr. Mark Grady is also denying knowing nothing about this brief. That means that it could have been an impersonation. Unconfirmed rumors have it that two individuals by the names: Steven Omoreghe, an unauthorized alien and David Oluwole Ojo Onipede, an illegal alien with stowaway status wrote the brief without authorization from the U.S. Attorney's Office. That's probably the reason the brief was **not** signed.

Besides, Hon. Judith Dein, Magistrate Judge, submitted her Report and Recommendations around October 19, 2005. In addition, Hon. Nancy Gertner, District Judge, made it known by electronic mail that her court was going to adopt Hon. Dein's report and recommendations. The general assumption based on these two steps is that the end of the Judicial review is probably in view. If this assumption is correct, Your Honor, making a new motion for dismissal of petition for judicial review at this stage is probably a wrong step except of course if the writer or writers of the Dec. 21, 2005 brief is or are unaware of the decision of the substantive Judge, the Hon. Nancy Gertner to adopt Hon. Dein's recommendations.

Your Honor, Petitioner is moving that the brief from the U.S. Attorney's Office that the Petitioner's petition for Judicial Review be dismissed be ignored in the interest of justice and fair play. Asking for a dismissal after the substantive Judge had made up her mind to adopt the recommendations of the Magistrate Judge is improper.

"The right of a person to become a naturalized citizen of the United States shall not be denied or abridged because of race or sex or because such a person is married." 8 USC §1422.

Any decision that is contrary to approval of Petitioner's application for naturalization will **not** only violate the five-year statute of limitations, it will jeopardize the interest of Petitioner. Petitioner's application for a change of status was filed in 1988 and 1989 respectively and that for naturalization was submitted in 1993 and 1995 respectively. Both applications were filed more than ten years ago! "After five years, the alien's status is unassailable." 8 USC §1256(a); Quintana v. Holland, 255 F.2d 161, 166 (3rd Cir. 1958); Fulgencio v. INS, 573 F.2d 596, 599 (9th Cir. 1978); Hughes, et al. v. Tropello, 296 F. 306 (3rd Cir. 1924); and McCandless v. United States ex rel. Swystun, 33 F.2d 882, 883 (3rd Cir. 1929).

Thank you very much, Your Honor.

NAME: Michael A. Faturoti.   SIGNATURE: [signature]   DATE: 12/27/2005.

Enclosed: Excerpts from Pivec & Lamdin and Ledvinka & Scarpello.

the status of the temporary agricultural worker to that of a permanent legal alien after the alien has worked ninety days of seasonal work during each of three years of seasonal employment. As a practical matter, this provision **treats any seasonal agricultural worker as a permanent resident, because one hour of work in a given day is counted as one day's work.**

## Penalties for Violating IRCA

Penalties for hiring illegal aliens are high. Employers may be penalized not less than $100 and not more than $1,000 for each failure to obtain and keep the necessary identity and work eligibility documents. In addition, employers found guilty of hiring illegal aliens are subject to the following penalties:

First offense: $250 to $2,000 for each illegal worker
Second offense: $2,000 to $5,000 for each illegal worker
Additional offenses: $3,000 to $10,000 for each illegal worker

Employers found guilty of repeated offenses are subject to imprisonment for a period of up to six months for each illegal alien they have hired. Finally, employers can be ordered to hire adversely affected individuals, with or without back pay.

## IRCA's Regulatory Apparatus

The Immigration Reform and Control Act is administered and enforced by a complicated regulatory apparatus, with responsibilities divided among six federal entities as well as state agencies.

The Immigration and Naturalization Service is responsible for border patrol, inspection of employment verification records, and other enforcement activities focused on deterring illegal entry of aliens into the United States. The U.S. Department of Labor is also responsible for inspection of employment verification records. Additionally, the Secretary of Labor is authorized to extend or withhold labor certifications for foreign seasonal agricultural workers. The National Labor Relations Board is responsible for union certification elections and investigation and prosecution of unfair labor practice charges.

The Justice Department has several responsibilities. The U.S. Attorney General is responsible for (a) legalizing the status of alien workers, (b) de-

veloping procedures for investigating illegal hiring complaints, (c) selecting administrative law judges to rule on IRCA violations, and (d) prosecuting cases in U.S. courts. The U.S. court system is the final mechanism for appealing both complaints and penalties.

The complexity of IRCA enforcement can be attributed to the large number of agencies that may be involved in an IRCA case. Complaints may be handled by the Immigration and Naturalization Service, EEOC, the Special Counsel, the National Labor Relations Board, or the Attorney General. Hearings may be conducted by a variety of personnel.

The IRCA allows investigators to examine evidence of any person or entity being investigated. Administrative law judges may subpoena relevant material and witnesses, and the parties involved in the case can request a hearing with the administrative law judge. If neither party requests a hearing, the Attorney General can impose the penalties for hiring illegal aliens. The judge's ruling is final, unless one of the parties appeals the decision through the U.S. courts. The Attorney General issues the order for compliance with the established penalties. Should the ordered party fail to comply or appeal, the Attorney General files a suit for compliance in federal district court.

Other government agencies may also be involved. For example, the Office of Federal Contract Compliance Programs (OFCCP) is authorized to remove economic incentives for employers who hire illegal aliens. Any accompanying violations of the Occupational Safety and Health Act would be enforced by the Occupational Safety and Health Administration and the Occupational Safety and Health Review Commission (see Chapter 10). Discriminatory employment practices of employers with fifteen or more employees may be enforced by EEOC.

## Does IRCA Encourage National Origin Discrimination?

One problem with IRCA is that its penalties for hiring illegal aliens can motivate employers to discriminate against applicants and employees who are "foreign looking" or "foreign sounding." A report released by the Mexican-American Legal Defense Fund[17] described several ways that employers discriminate:

refusing to accept valid work authorizations
requiring that all employees be able to speak English

*Sources: J. Ledvinka & Vida Scarpello. Federal Regulations*

## IMPLICATIONS OF IRCA OF 1986

penalties for violations of the employer sanctions laws. Hence, the Attorney General could not even cite an agricultural employer during this extended grace period.[23]

### Civil Penalties

IRCA provides a graduated system of civil penalties for substantive violations, i.e., knowingly hiring or knowingly continuing to employ unauthorized aliens.[24] In a first proceeding, employers and recruiters can be fined from $250.00 to $2,000.00 with respect to each unauthorized alien. In a second proceeding, where the employer or recruiter has been the subject of a prior final sanctions order, the extent of the civil fines increase to the level of between $2,000 to $5,000 for each unauthorized alien. If the employer or recruiter should become the subject of later proceedings, the fines increase to $3,000 to $10,000.00 for each unauthorized alien.

Violations of the paperwork provisions are not included within the graduated penalties scheme. The range of fines which can be levied for paperwork violations is a minimum of $100.00 and a maximum of $1,000.00, with respect to each employee.[25] The amount of the penalty is determined based on the size of the employer, the good faith of the employer, the seriousness of the violation, whether or not the employee is an unauthorized alien, and the history of previous violations. INS has taken the public position that it will not fine employers for paperwork violations unless they are found in combination with substantive violations or they are egregious in nature. What constitutes egregious misconduct has yet to be defined by INS.

### Criminal Penalties

IRCA provides for criminal penalties based on a pattern or practice of substantive violations (i.e., non-paperwork violations) of the employer sanctions provisions.[26] The legislative history indicates that the term "pattern or practice" takes its meaning from the judicial interpretation handed down by the Courts in various civil rights cases holding that the term refers to regular, repeated and intentional violations of the law.

A pattern or practice violation of IRCA is a misdemeanor, the penalties for which are $3,000.00 with respect to each unauthorized alien involved and up to six months in jail for the entire pattern or practice. Although one employer has pled guilty to a criminal pattern or practice violation of IRCA and has agreed to pay a fine of $60,000, to date no employer has been found guilty by a court or jury of such a violation.

Far more serious criminal consequences flow from the IRCA amendments to the U.S. criminal code which make it a felony to enter false information or

---

[23] 8 U.S.C. § 1324a(i)(3), incorporating by reference the application period set forth in 8 U.S.C. § 1160(a)(1)(A).

[24] 8 U.S.C. § 1324a(e)(4).

[25] 8 U.S.C. § 1324a(f).

[26] 8 U.S.C. § 1324a(e)(5).
xxx

Mary E. Pivec & Ann Lamdin, Practical Implications IRCA 1986

## IMPLICATIONS OF IRCA OF 1986

### Recruiter Coverage

Recruiters are covered by IRCA to the extent they refer or recruit for a fee. The INS has defined the term "refer for a fee" as "the act of sending or directing a person or transmitting documentation or information through another, directly or indirectly, with the intent to obtain employment for such person, for remuneration, whether on a retainer or a contingency basis." Similarly, the INS has defined the term "recruit for a fee" as "the act of soliciting a person, directly or indirectly, with the intent of referring that person to another, for remuneration whether on a retainer or a contingency basis." INS regulations excluded union hiring halls from coverage.[9]

Recruiters are exposed to the same verification requirements as employers. Indeed, the INS has levied a $60,000 fine against a Chicago temporary agency for failing to verify the employment eligibility of referrals.[10]

### Employee Coverage

INS regulations define "employee" as an individual who provides services or labor for an employer for wages or other remuneration.[11] The regulations exclude independent contractors and those who provide domestic service in a private home that is sporadic, irregular or incidental from the definition of employee. INS framed the regulatory language to embrace the broadest possible definition of employment so as to dissuade employers of aliens from fashioning imaginative relationships that would elude coverage. The definition of employee was borrowed from regulations issued under the Fair Labor Standards Act ("FLSA")—protective labor legislation meant to be liberally applied in favor of workers. It is questionable whether the FLSA should be the basis for defining employee coverage in IRCA cases where the same sociological considerations are not at issue and where neither the employer nor the individual may contemplate formation of a permanent employer-employee relationship.

The INS has defined an "independent contractor" as an individual or entity that carries on an independent business, contracts to perform work according to his or its own means and methods, and is subject to control only as to results.[12] Whether or not an individual or entity qualifies as an independent contractor will be tested on a case-by-case basis. The INS has identified the following factors as indicative of independent contractor status: (1) supplying one's own tools or materials; (2) offering services to the general public rather than to a single employer; (3) controlling the order or sequence in which work is to be done; and (4) determining one's own hours of work. These factors are borrowed from the regulations of the Internal Revenue Service ("IRS") which has issued rulings applying the factors in virtually every occupation. The INS intends to rely on

---

[9] 8 C.F.R. § 274a.1(d) and (e).

[10] See, "Firm Hit With $308,000 Fine Settles With INS For $60,000", BNA Daily Labor Report No. 167, A-9, 8/29/88.

[11] 8 C.F.R. § 274a.1(f).

[12] 8 C.F.R. § 274a.1(j).

XXII

Source: Mary E. Pivec & Ann Lamdin